Ethan Jacobs (SBN 291838)
ethan@ejacobslaw.com
ETHAN JACOBS LAW
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel.: (415) 275-0845

James Slater (*pro hac vice* forthcoming)
james@slater.legal
SLATER LEGAL PLLC
333 S.E. 2nd Avenue #2000
Miami, Florida 33131
Tel.: (305) 523-9023

*Attorneys for Plaintiff*
*Pablo Marquez*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PABLO MARQUEZ, p/k/a PABLO STANLEY, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| WILLIAM MOYNIHAN, | |
| Defendant. | **JURY TRIAL DEMANDED** |

1

Plaintiff Pablo Marquez, p/k/a Pablo Stanley, asserts the following claims against Defendant William Moynihan:

**INTRODUCTION**

1.      Pablo Marquez brings this declaratory judgment action to lift the cloud that William Moynihan has cast over *Robotos*, Marquez's well-known nonfungible token (NFT) project.

2.      Marquez is a commercial artist and entrepreneur who created a collection of 10,000 illustrations (the "*Robotos* Works") to license to buyers using nonfungible cryptographic tokens. He brought on Moynihan—a purportedly technically savvy stranger who claims to work at Visa, Inc. developing web applications—to help modify existing open-source code for the "smart contract" that would "mint" the tokens. A month later, flaws in Moynihan's code nearly sank the project and Moynihan agreed to leave the project, but not before being paid 167.103 Ethereum, cryptocurrency worth roughly $419,000 at the time. Although Moynihan was no longer involved in the project, Marquez continued to pay him discretionary royalties, then later decided to use those royalties to hire additional staff and further develop his project. Despite receiving nearly $900,000— more than half of which were derived from aftermarket sales that had nothing to do with the minting—Moynihan threatened to disparage Marquez and claim ownership in the *Robotos* Works unless Marquez agreed to indefinitely pay him a third of future royalties from the project.

3.      Marquez's counsel sent Moynihan a cease-and-desist letter rebutting his claims of entitlement to royalties and cautioning him against following through with his threats to interfere with Marquez's ongoing collaborations. *See* Letter from J. Slater dated December 20, 2021, attached as **Exhibit 1**.

4.      Moynihan's counsel responded by reiterating his demand and falsely claiming (1) joint authorship and ownership over the *Robotos* Works and any derivative

works,[1] and (2) that Marquez's *Robotos* NFT project is a partnership. *See* Letter from A. Pahlavan dated January 12, 2022, attached as **Exhibit 2**. The letter threatened to sue for purportedly unpaid royalties derived from the sales of tokens licensing Marquez's artwork if not paid by January 19, 2022, and disputed Marquez's right to register *Robotos* Works with the Copyright Office as the sole author and owner.

5.     Accordingly, Marquez has a real and reasonable apprehension that he may be subject to liability because of Moynihan's claims. Marquez therefore seeks a declaration that he is the sole author and owner of all the *Robotos* Works and that the *Robotos* NFT project is not a partnership.

## JURISDICTION AND VENUE

6.     This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Copyright Act, 17 U.S.C. § 101, *et seq.*, and the California Declaratory Judgment Act, California Civil Procedure Code § 1060.

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a substantial and concrete controversy between the parties of sufficient immediacy that warrants a declaratory judgment. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338 because this matter involves an action arising under the Copyright Act. This Court also has supplemental jurisdiction over Marquez's state law declaratory relief claim under 28 U.S.C. § 1367 because that claim is interrelated with his federal claim and arises from a common nucleus of operative facts such that the adjudication of the state law claim and federal claim together furthers the interest of judicial economy.

---

[1] Marquez licenses other original artwork associated with *Robotos*, such as *Robopets*, sells *Robotos* merchandise, and is creating a 2-D metaverse for the project. Marquez is also developing an animated children's show based off the *Robotos* concept, but with new, original artwork. *See* Alex Weprin, *Time Studios to Develop Animated Children's Series Based on "Robotos" NFTs*, THE HOLLYWOOD REPORTER (Nov. 23, 2021), https://www.hollywoodreporter.com/tv/tv-news/robotos-kids-tv-series-time-studios-1235051846/. Moynihan's contentions in his counsel's letter have led Marquez to believe that Moynihan is claiming ownership rights in each of these projects and any other project that Marquez conceives related to *Robotos*.

8.      This Court has personal jurisdiction over Moynihan and venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b) because Moynihan resides in this District and his wrongful assertion of rights in Marquez's works occurred in this District.

## PARTIES

9.      Plaintiff Pablo Marquez, p/k/a Pablo Stanley is a designer, artist, and entrepreneur, who resides in Mexico City, Mexico. Along with Zack Tanner, Marquez is the co-founder of Blush, a tool that helps designers find and use customizable illustrations. Marquez also gives design workshops, online tutorials, and manages Latinx Who Design, a directory of thriving Latinxs in the design industry.

10.     As a prolific artist, Marquez has created multiple online works that he licenses for personal and commercial use, such as *Avataaars*, *Humaaans*, *Open Doodles*, *Bottts*, and *Buttss*. Marquez is also the sole creator and designer of the *Robotos* Works, one of which he uses as his online avatar, often with different backgrounds and accessories he creates:



11.     Defendant William Moynihan is an individual who, upon information and belief, resides in Granite Bay, California.

## GENERAL ALLEGATIONS

### A. From *Bottts* to *Robotos*

12.     On July 8, 2021, Moynihan, with whom Marquez had no previous relationship or knowledge, contacted Marquez by direct message on Twitter to ask

4

whether Marquez was behind the *MetaBots* NFT project or if someone else was using Marquez's publicly available *Bottts* library, which features licensed robot-like images.

13.   Marquez responded that the *Meta Bots* NFT project was not his and told Moynihan that he was starting a new project and was interested in adapting it to the NFT space.

14.   They discussed how to best launch an NFT project, with Moynihan advising Marquez not to do the "mint" (creation of the tokens) on the OpenSea platform but instead to create a proprietary smart contract. Marquez agreed.

15.   On July 10, Marquez started to build his *Robotos* project, creating a design board on the online workspace Notion under the project name "Robotos" and announcing on Twitter that he was going to release a new collection of bots:



16.   The next day, Marquez announced on Discord to a general audience that he was launching a new art project, with a link to his "Robotos" workspace on Notion. He also completed his first *Robotos* image asset titled "bot01.png":

5



17.     Marquez also drew some of the initial *Robotos* sketches on livestreams and shared his progress online:



18.     While Marquez was publicly unveiling his new *Robotos* NFT project, he and Moynihan continued to communicate about it, with Marquez asking Moynihan for "whatever help" he could provide.

19.     In exchange for Moynihan's help, Marquez offered to split the royalties generated from the initial mint with Moynihan and Tanner, who would also work on the *Robotos* project.

6

20.    At all times material hereto, Moynihan was working for Marquez as a contractor. At no time did Marquez or Moynihan agree to form a partnership related to the *Robotos* NFT project.

21.    Instead, the *Robotos* NFT project is Marquez's sole creation and project.

22.    On July 12, 2021, Marquez created a private Discord group with Tanner and Moynihan to introduce them.

23.    In that group, Marquez immediately shared his production board, a FAQ document for his NFT project, an outline of initial project responsibilities for each group member, and a proposed launch date for his project.

24.    Marquez assumed complete operational and managerial control of his art project, as well as the creation of the *Robotos* Works.

25.    At no time during his involvement in the project did Moynihan or any other individual contribute any material to the *Robotos* Works.

26.    At no time during his involvement in the project did Moynihan have control over the project or the right of joint participation in the management and control of the project.

27.    As soon as Marquez created the Discord team chat, he instructed Moynihan and Tanner to complete certain tasks in connection with the project. For Moynihan, those tasks were primarily determining which repository to use for hosting Marquez's artwork and building the smart contract.

28.    Between July 12, 2021 and August 4, 2021 (the project minting date), Marquez designed all the artwork and branding associated with the project while he delegated tasks to Moynihan and Tanner. At no time did Marquez delegate any role to Moynihan or any other person that included designing, conceptualizing, modifying, altering, or otherwise contributing to the *Robotos* Works.

29.    As noted above, Moynihan's primary role on the team was to build the smart contract to mint the tokens. This smart contract, built on an MIT permissive license, essentially facilitates the purchase and sale of each *Robotos* NFT.

7

30.     The smart contract does not include any of Marquez's proprietary artwork.

31.     Instead, the smart contract points to the InterPlanetary File System (IPFS), an online repository that allows users store files associated with specific and unique content identifiers, in this case Marquez's 10,000 illustrations.

**B. Moynihan's Bug-Ridden Code Almost Destroys *Robotos***

32.     On August 4, 2021, after a presale, the *Robotos* NFT project was minted, meaning the tokens were published on the Ethereum blockchain and could be purchased by the public.

33.     Each of those 10,000 tokens is associated with one specific illustration from among the *Robotos* Works.

34.     Marquez alone created the *Robotos* Works and he alone exercised all control over their development, fixation, publication, and use.

35.     At no time did Marquez manifest any intent to be a co-author of these works with Moynihan.

36.     Moynihan's name never appeared in connection with the *Robotos* Works and the consuming public views these works as Marquez's sole creations.

37.     When a purchaser buys a token associated with a specific *Robotos* Work, they get access to image assets associated with that specific illustration (GIF, PNG, and SVG files), and they are entitled under Marquez's *Robotos* NFT Licensing Agreement to use and remix that illustration. *See Robotos* NFT Licensing Agreement, www.robotos.art/license, attached as **Exhibit 3**.

38.     The license identifies Marquez as the "sole author and creator" of the "Permissible Work," which is defined as the "visual, literary, dramatic, artistic, and subject-matter works and content tied to the Robotos NFT." *See id.*

39.     Apart from licensing the *Robotos* Works in connection with the tokens, Marquez has not otherwise assigned or transferred any ownership rights in the *Robotos* Works.

40.     Once the tokens were sold at minting, royalties were distributed to a wallet. Marquez then set up accounts on OpenSea and Nifty Gateway—online NFT marketplaces—to distribute royalties from after-mint sales. Marquez maintained control over the marketplace accounts, determining where the after-mint royalties would be distributed.

41.     During the mint, it became immediately clear that Moynihan's portion of the smart contract code was bug laden with a "last token" bug.

42.     Moynihan had botched the code with the result that the smart contract would undo the final token's mint unless called by the *Owner*, which, instead of being a purchaser's wallet, was a wallet that the parties had access to and control over. This could have created what's known as a "gas war," where potential purchasers of either the last token or a set number of tokens that would include the last token would increase their "gas" (or fees to place a bid on the token) but would never be able to purchase the last token or that set of tokens and would forfeit all the gas.

43.     A gas war would have been a disaster, so the team paused the minting before all the tokens were minted and then restarted the process without warning. Many potential purchasers had failed transactions, forfeiting their gas, and the *Robotos* community was discontented.

44.     Moynihan then tried to direct the community to purchase the tokens from the *Robotos* website, but Moynihan—who had not tested his code and had taken shortcuts putting it together—had not configured the process properly and potential purchasers could not complete transactions.

45.     Moynihan's mistakes led to "FUD" (or fear, uncertainty, and distrust) in the project. That doubt continues to permeate social media. For example:



46.     When confronted with the fact that his contributions to the smart contract were damaging the minting, Moynihan was dismissive and arrogant.

47.     Due to Moynihan's ineptitude, uncooperative conduct, and lack of concern for the project, Marquez, as the owner and creator of the *Robotos* NFT project, fired him on the day of the minting.

48.     Rather than publicly blame Moynihan, Marquez allowed him to craft a departure message explaining that he would be "stepping down from [his] dev role on the Robotos team," which he later shared in the *Robotos* Discord channel:



49.     Despite terminating Moynihan from the project, Marquez, though not legally or contractually required to do so, decided to continue to pay Moynihan royalties derived from the aftermarket sales of *Robotos* tokens.

50.     On August 20, 2021, Marquez messaged Tanner and Moynihan that he wanted to discuss further growing the project, including hiring staff and engaging in collaborations. Marquez intended to reduce everyone's royalty share and wanted to gather Tanner and Moynihan's opinions, as their revenues would be reduced as well. Moynihan wanted more details about "investing" his royalties in the project and Marquez decided that *he* was going to "do something different."

51.     The next day, Marquez removed Moynihan as a moderator on the *Robotos* Discord server, telling him "it has been enough time for you to stay there for optics." Moynihan responded "All good. I was just helping out in my free time."

52.     The project continued to grow without Moynihan's involvement, and Marquez, at his discretion, continued to pay Moynihan. In total, Marquez paid Moynihan just under $900,000.

53.     Then, on November 23, 2021, Marquez wrote to Moynihan that he was changing royalty sharing to create a community fund and "as a gesture for creating the contract, [he'd] keep [Moynihan] in the royalties at 3%."

54.     In response, Moynihan made threats to interfere with Marquez's children's television project and future projects, telling him "I know what's at stake with the Time deal and any other brand deals in the future. You know my wallet address. Send all my royalties today."

**C. There is an Actual Controversy Between the Parties**

55.     On December 20, 2021, Marquez's counsel sent Moynihan a letter demanding that Moynihan stop (1) claiming any ownership in the *Robotos* NFT project, (2) demanding that Marquez reinstate his royalty sharing, and (3) making threats to tortiously interfere with Marquez's business endeavors. *See* Ex. 1.

56.     On January 12, 2022, Moynihan's counsel responded in a brief letter without any legal support and armed with out-of-context quotes to assert (1) that *Robotos* is a partnership to which Moynihan belongs and (2) that Moynihan is a joint author and co-owner of the *Robotos* Works. *See* Ex. 2. He did not—and cannot—claim there was a binding agreement to pay Moynihan royalties from the project.

57.     Moynihan's letter has given rise to uncertainty and controversy with respect to the *Robotos* NFT project and works. Marquez seeks to resolve this dispute as promptly as possible so that he can focus on creating art and media without the threat of Moynihan's baseless claims that he owns part of Marquez's current and future projects.

58.     To resolve these claims and afford relief from the uncertainty and controversy caused by Moynihan's actions, Marquez is entitled to a declaratory judgment.

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment for Ownership of Copyright –
### 28 U.S.C. §§ 2201, *et seq.*; 17 U.S.C. §§ 101, 201(a))

Marquez incorporates herein by reference each and every allegation contained in paragraphs 1 through 58 above as if fully set forth herein.

59.     Marquez is the sole author and copyright owner of the *Robotos* Works, which he nonexclusively licenses to purchasers of the *Robotos* tokens.

60.     Moynihan wrongly claims that he is a joint author of the *Robotos* Works despite having made no contributions to the works.

61.     Marquez denies that Moynihan is a joint author of any of the *Robotos* Works: Marquez exercised complete control over the works and their creation, did not have or manifest any intent to be a co-author with Moynihan, and represented to the public that he was the works' sole author.

62.     Moynihan also wrongly claims that he is a co-owner of the *Robotos* Works, despite not authoring them or having been assigned any rights thereto.

63.     As the works' sole author, Marquez owns all copyright in the *Robotos* Works, which he has not assigned or otherwise encumbered to any third party, including Moynihan.

64.     Moynihan wrongly claims that he is entitled to copyright ownership rights in Marquez's derivative works.

65.     Marquez denies that Moynihan is entitled to any right, title, or interest in or to the copyright in any of the *Robotos* Works or any derivative works based on them.

66.     There is an actual and substantial controversy between Marquez and Moynihan arising under the Copyright Act regarding authorship of the *Robotos* Works and ownership of the copyright in the *Robotos* Works.

67.     Accordingly, Marquez seeks a judgment declaring that: (1) Moynihan is not a joint author of any of the *Robotos* Works, (2) the *Robotos* Works are not a joint work, and (3) Moynihan has no right, title, or interest in the copyrights in the *Robotos* Works.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief – Cal. Code Civ. Proc. § 1060)

Marquez incorporates herein by reference each and every allegation contained in paragraphs 1 through 58 above as if fully set forth herein.

68.     An actual controversy exists between Marquez and Moynihan as whether the *Robotos* NFT project is a partnership in which Moynihan is a partner.

69.     Marquez is the sole owner of the *Robotos* NFT project and the intellectual property the project licenses.

70.     At no time did Marquez and Moynihan agree to conduct the project as a partnership, nor did the conduct and surrounding circumstances of the project create a partnership.

71.     Specifically, at all times material hereto, Moynihan has never had the authority to manage or control the *Robotos* NFT project and in fact never took any actions to manage or control the project.

COMPLAINT

72.     Marquez alone exercised all management and control of the *Robotos* NFT project and Moynihan had no degree of participation in management or control of Marquez's project.

73.     Additionally, at all times material hereto, Marquez has solely owned and controlled the project's primary asset: Marquez's licensed artwork.

74.     At no time did Moynihan agree to share in any of the losses of the project or otherwise pay any expenditures related to the project.

75.     Despite having no ongoing role in the project, Moynihan wrongly claims that the *Robotos* NFT project is a partnership and that he is a partner in that purported partnership, entitling him to continued royalties from the secondary market exploitation of *Robotos* NFTs and sales of derivative works.

76.     Moynihan has threatened to immediately sue Marquez for the purportedly due and unpaid royalties and seek an accounting of royalties generated by the project.

**77.**     Accordingly, Marquez is entitled to a declaratory judgment that the *Robotos* NFT project is not a partnership.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pablo Marquez, p/k/a Pablo Stanley respectfully requests judgment against Defendant William Moynihan as follows:

78.     Find and declare that (1) Moynihan is not a joint author of the *Robotos* Works, (2) the *Robotos* Works are not a joint work, and (3) Moynihan has no copyright ownership interest in the *Robotos* Works;

79.     Find and declare that (1) Marquez and Moynihan did not form a partnership and (2) the *Robotos* NFT project is not a partnership;

80.     Award Marquez costs in this action, including reasonable attorneys' fees pursuant to 17 U.S.C. § 505; and

81.     Grant such other, further, and different relief as the Court deems just and proper.

14

Dated: January 20, 2022                    Respectfully submitted,


                                           */s/ Ethan Jacobs*
                                           James Slater (*pro hac vice* forthcoming)
                                           james@slater.legal
                                           SLATER LEGAL PLLC
                                           333 Southeast Second Avenue
                                           Suite 2000
                                           Miami, Florida 33131
                                           Tel.: (305) 523-9023

                                           Ethan Jacobs (SBN 291838)
                                           ethan@ejacobslaw.com
                                           ETHAN JACOBS LAW
                                           100 Pine Street, Suite 1250
                                           San Francisco, California 94111
                                           Tel.: (415) 275-0845

                                           *Attorneys for Plaintiff*
                                           *Pablo Marquez*

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Pablo Marquez hereby demands trial by jury in this action on any issue triable of right by a jury.

Dated: January 20, 2022                    Respectfully submitted,


                                        */s/ Ethan Jacobs*
                                        James Slater (*pro hac vice* forthcoming)
                                        james@slater.legal
                                        SLATER LEGAL PLLC
                                        333 Southeast Second Avenue
                                        Suite 2000
                                        Miami, Florida 33131
                                        Tel.: (305) 523-9023

                                        Ethan Jacobs (SBN 291838)
                                        ethan@ejacobslaw.com
                                        ETHAN JACOBS LAW
                                        100 Pine Street, Suite 1250
                                        San Francisco, California 94111
                                        Tel.: (415) 275-0845

                                        *Attorneys for Plaintiff*
                                        *Pablo Marquez*

COMPLAINT

# Exhibit 1



December 20, 2021

*Via Electronic Mail Only*
William Moynihan
wdm954@gmail.com

**Re:   Demand to Immediately Cease and Desist Tortious
Interference and False Claims of Ownership in "Robotos"**

Mr. Moynihan:

This law firm represents Pablo Marquez p/k/a Pablo Stanley. If you are
represented by counsel, please immediately forward this correspondence to counsel,
and inform me of the same so that I may directly communicate with your counsel.

As you know, my client is the creator of the successful collection of droid
characters called "Robotos," which were solely conceived and developed by my client
and then minted as nonfungible tokens (NFTs). You were employed by my client to
assist in the minting of his developments as NFTs, for which you were handsomely
compensated for subpar work. Now that my client has informed you that no further
payment is forthcoming, you have taken the low road. Specifically, you have
demanded continuing payment for providing shoddy, buggy code, seemingly in
perpetuity, and have threatened to tortiously interfere with my client's business
relationships. This letter serves as formal notice to cease and desist any further
efforts to threaten my client's business relationships or otherwise claim any interest
in my client's "Robotos" project. I will address both matters in more detail below.

## I.    You are not entitled to any further payments

You were hired to develop code for my client to effect the sale of the "Robotos"
NFTs. Because the project would not derive revenue until the NFTs were minted
and sold, you were to be paid based on the initial revenues of the project. Unlike
many developers who work in exchange for royalties or revenue sharing in startups,
you were able to realize income—significant income. This is entirely because the
consuming public believed in my client's ideas and artistic creations. Your code to
help put together the smart contract is not and cannot be the reason consumers
were drawn to "Robotos" and overwhelmingly became collectors of the NFTs. In fact,
your code was faulty and almost destroyed my client's project and the brand
awareness and goodwill associated with it and my client. For this reason, in August
2021 my client terminated your involvement in the "Robotos" project. And you
understood that you were terminated as a contractor when you announced on

_____

Discord that you were "stepping down from your dev role" with the project. *See* August 5, 2021 message, attached as **Exhibit A**.

Despite terminating your involvement in the project, my client generously—and without any contractual or legal obligation to do so—continued to pay you for the work you previously performed. My client even offered you an opportunity to invest in his "Robotos" project, which you declined. Then, in November 2021, my client, as a "gesture for creating the [NFT] contract," offered to continue paying you 3% of the "Robotos" royalties, with an admonition that this gesture was subject to change. *See* November 23, 2021 message, attached as **Exhibit B**. In response, you implied that you would take action to sabotage the "Robotos" forthcoming media project with Time Studios. *See* November 26 and 30, 2021 messages, attached as **Exhibit C** (referencing a provocative cartoon by my client involving sexual violence in connection with the forthcoming "animated Robotos kids series"). The next day you demanded continuing royalties, claiming that you had an agreement with my client for these royalties *in perpetuity*. *See* November 27, 2021 message, attached as **Exhibit D**. You posted a screenshot of a previous direct message with my client, in which my client indicated he was interested in learning about smart contracts. In your view, that message somehow supports your argument that you are a partner, owner, or otherwise entitled to continued revenues of the project. For the following reasons, among others, you are incorrect.

*First*, you are not the creator or owner of the "Robotos" works pursuant to 17 U.S.C. § 201(a). The U.S. Copyright Act does not bestow upon you any ownership rights in the underlying "Robotos" designs or works. And it is clear from the "Robotos" license that my client is the sole licensor of the works. *See* Robotos NFT Licensing Agreement, https://www.robotos.art/license (listing Pablo Stanley as the Licensor of the "Robotos" Permissible Work).

*Second*, the project is not a partnership, but rather my client's sole art and business project, which means you have no legal right to continued royalties or revenues. You were hired to perform work. You underperformed and were terminated. And nevertheless, you received exorbitant sums. That's it. The law does not support your claim that you're somehow my client's partner entitled to continuing payments or royalties. There was never any agreement to be partners, and your performance of work in exchange for a discretionary revenue share or royalty does not establish a partnership, including in your jurisdiction of California (where my client does not reside). *See Sperske v. Rosenberg*, No. 2:12-cv-07034-ODW(JCx), at *2 (C.D. Cal. July 23, 2013) ("profit sharing is not sufficient to demonstrate a partnership as such sharing could just as easily constitute wages for employment"). Your position in the November 27, 2021 Discord message fails for the same reason the court found that the plaintiff was trying to retroactively invent a partnership in *Sperske*—no one else thinks you're a partner or that this is a

partnership. No efforts were made to treat the royalties as partnership proceeds, and you are not the creative and managerial voice behind "Robotos." *See id.* at *2–3; *see also Fredianelli v. Jenkins*, 931 F. Supp. 2d 1001, 1020 (N.D. Cal 2013) (finding that even though profits were shared, no partnership existed because plaintiff was shut out of managerial and creative decisions). Instead, my client is the sole author and creator of the works, as evidenced by *his* NFT license on the "Robotos" website, among other things. Although my client appreciated your input, it was he alone who made business decisions for the project and delegated tasks to you as the project's developer.

*Third*, as a contractor, you have no legal right to further share in the royalties or revenues of the "Robotos" project without an agreement to that effect. There is no written or oral agreement to that effect. And even if you claimed there was an oral agreement (which there is not), such an agreement for perpetual revenues or royalties would violate the Statute of Frauds and therefore would not be enforceable. **Instead, you were generously given a temporary, discretionary interest in the revenues of the project in exchange for your services, which my client, in his sole and absolute discretion, terminated.**

In sum, you have been exceedingly compensated. I highly advise you to refrain from taking any action that could expose you to liability, such as claims of ownership over the "Robotos" project, which my client squarely owns, or otherwise tortiously interfering with my client's business.

## II.     Your threats, if actualized, are actionable

As I have cautioned throughout this letter, you are on the cusp of serious legal jeopardy for tortious interference. As you know, my client secured a deal with Time Studios to adapt "Robotos" to visual media. To extract sums from "Robotos" to which you are not entitled, you have threatened to jeopardize the Time Studios collaboration by broadcasting some of my client's previous R-rated work. The previous work is no secret; nevertheless, your intent to disrupt the business as a ransom for sums you are not due is a serious, and potentially costly misstep.

In your jurisdiction, tortious interference requires (1) a valid contract between the plaintiff (my client) and a third party (Time Studios); (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *See Lab. Specialists Int'l, Inc. v. Shimadzu Sci. Instruments, Inc.*, G054056, at *11 (Cal. Ct. App. Oct. 23, 2017) (defendant may be liable even if he's a "stranger" to plaintiff's contract or plans with third party); *see also United Medical Devices, LLC v. PlaySafe, LLC*, B250305, at *19 (Cal. Ct. App. Mar. 2, 2015). In this case, you have evidenced a

---

specific intent to ruin my client's relationship with Time Studios, *see* Ex. C, which the mere disruption of the contract could cause my client damages.

Please understand that if you continue to threaten my client's business endeavors or otherwise continue to claim any ownership related to the "Robotos" project, **he will pursue legal action against you**. Instead, I hope this opportunity to educate you on the law will result in your prompt and immediate corrective action. As such, my client will not be paying you any more discretionary sums. Absent any further threats from you, my client will consider this matter closed.

This letter is not an exhaustive statement of my client's rights and remedies against you in connection with the facts contained herein, all of which are expressly reserved.

Sincerely,
Slater Legal PLLC

James Slater
*for the firm*

Enclosures

# Exhibit A



# Exhibit B



Sivara, ztanner

November 23, 2021

**pablostanley** 11/23/2021
Hi Bill, I hope that you're doing well today.

We're changing our royalties to start a community fund at the Robotcs. This fund is to continue growing the project and bring more people in to help us shape its future.

We're also adding the team to the royalties, so they keep being motivated while growing Robotos and as an appreciation of all their hard work. As a gesture for creating the contract, we'll keep you in the royalties at 3%.

We'll let you know if any of this changes.

Message Sivara, ztanner

# Exhibit C





# Exhibit D



# Exhibit 2

PerkinsCoie

3150 Porter Drive          +1.650.838.4300
Palo Alto, CA 94304-1212   +1.650.838.4350
                           PerkinsCoie.com

**Arman Pahlavan**
APahlavan@perkinscoie.com
D.  +650.838.4426
F.  +650.838.4626

January 12, 2021

James Slater, Esq.
Via Email:  james@slater.legal

Dear Mr. Slater:

Our firm represents Mr. William Moynihan in connection with the "Robotos" NFT collection.

We received your letter dated December 20, 2021.  We disagree with your assertions and believe that you have had to stretch far and wide to come to the conclusion that Mr. Moynihan was a "contractor" and that he has no ownership rights in "Robots." Instead of getting into detailed discussions regarding the matters stated in your letter, these issues will be vetted out in due course in legal actions if your client so choose to proceed.

The last correspondence between the three partners in "Robotos" was for them to get into discussions and come to conclusions about their relationship.  We think that was the right thought process and your letter and its assertions are damaging to the course of actions that the three partners need to pursue. Your reference to 17 U.S.C. § 201(a) is devoid of any reasoning and appears to ignore the actual content of the subsection you cite.  As provided in that subsection, the authors of a joint work are co-owners of copyright in the work. Further, you appear to have no basis for an independent claim of ownership of copyright or application for registration to the Robotos NFT works given that Mr. Moynihan is a joint author and has not assigned his rights to Mr. Marquez or any other party.

Let it stand that we are informing you that Mr. Moynihan is a one third partner in a partnership that has created the "Robotos" and has equal ownership in any copyright or derivative assets arising from "Robotos" or the efforts of the other two individuals related to "Robotos."

We demand that your client immediately pays Mr. Moynihan the royalties that are due and owing to him pursuant to their unambiguous agreement of "I would be down to split everything three ways" immediately together with the accounting related to such royalty payments.  In the event that royalties are not paid to Mr. Moynihan by January 19, 2022, he will pursue his rights at law and at equity to the fullest extent possible.

Sincerely,

Arman Pahlavan

155300486.3

# Exhibit 3

# ROBOTOS NFT LICENSING AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into effective as of the date of purchase (the "Effective Date"), by and between Pablo Stanley (hereinafter known as the "Licensor") and the NFT Buyer (hereinafter known as the "Licensee") of the copyrightable permissible work ("Permissible Work").

## DEFINITIONS

**"Agreement"** means the entire content of this document.

**"Robotos"** shall mean and refer to Licensor's creation of a unique digital collectible, also known as a NFT, that is managed entirely by the Ethereum network and the respective smart contract on that network.

**"NFT"** shall mean any blockchain-tracked, non-fungible token, also referred to as a 'token.'

**"Smart Contract"** shall mean lines of code or a transaction

protocol that is intended to automatically execute, control or document basic relevant events and actions according to the terms of an agreement. The code and the agreements contained therein exist across a distributed, decentralized blockchain network.

**"Permissible Work"** shall mean the visual, literary, dramatic, artistic, and subject-matter works and content

tied to the Robotos NFT.

# LICENSE

*Ownership Rights.* Licensor represents to be the sole author and creator of the Permissible Work and that the Permissible Work is an original work. Licensor agrees to have the sole and exclusive right to enter into this Agreement and the full warrant and authority to grant the rights granted hereby.

*Non-Exclusive.* Licensee acknowledges and agrees that the license granted herein is non-exclusive and that Licensor may license others to use the Permissible Work. Licensor shall have the right to assign and/or license its rights and obligations under this Agreement and all its right, title, and interest in the Permissible Work without the consent of Licensee.

*Scope.* Licensor hereby grants to Licensee, in accordance with the terms and conditions of this Agreement, a non-exclusive license to use the Permissible Work in the course of personal and commercial use and purposes. The license covers the non-exclusive right to reproduce, sell and distribute the Permissible Work, including reprints,

translations, photographic reproductions, microform, electronic form (offline, online), or any other reproductions of similar nature in accordance with the terms of this Agreement. Licensor grants you a non-exclusive worldwide license to use, copy, and display the purchased Art for the purpose of creating derivative works based upon the Art

*Assignment.* This Agreement (including, without limitation, the license granted hereunder) is personal to Licensee and shall not be assigned or transferred by Licensee, except to a new purchaser of all or substantially all of the Permissible Work licensed to the Licensee. Any other attempt on the part of Licensee to assign, sub-license, or transfer Licensee's rights under this Agreement, except as provided herein, shall be invalid and void.

*Accordance.* Licensee desires to obtain, and Licensor has agreed to transfer to and authorize the use of the Permissible Work by Licensee in accordance with the terms and conditions of this Agreement. Licensee's purchase and use of the Permissible Work, in whole or in part, indicates their assent to the terms and conditions of this Agreement; and acknowledgment to have read and be legally bound by the terms of this Agreement.

Acknowledged and agreed upon by Pablo Stanley, August 2021.

