1   Britt L. Anderson                                              THE HONORABLE JOHN A. MENDEZ
    BAnderson@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, California 94304-1212
    Telephone: 650.838.4300
4
    Christian W. Marcelo (pro hac vice application forthcoming)
5   CMarcelo@perkinscoie.com
    PERKINS COIE LLP
6   1201 Third Avenue, Suite 4900
    Seattle, Washington 98101-3099
7   Telephone: 206.359.8000

8
    Attorneys for Defendant and Counterclaimant
9
                              UNITED STATES DISTRICT COURT
10
                              EASTERN DISTRICT OF CALIFORNIA
11

12

13
    PABLO MARQUEZ, p/k/a PABLO            Case No. 2:22-cv-00123-JAM-KJN
14  STANLEY,
                                          ANSWER TO COMPLAINT FOR
15            Plaintiff,                  DECLARATORY JUDGMENT AND
                                          COUNTERCLAIMS
16       v.

17  WILLIAM MOYNIHAN,

18            Defendant.

19  WILLIAM MOYNIHAN,

20            Counter-Claimant,

21       v.

22  PABLO MARQUEZ, p/k/a PABLO
    STANLEY,
23
              Counter-Defendant.
24

25

26

27

28

155684535.7

Defendant William Moynihan ("Moynihan" or "Defendant") hereby answers the Complaint filed by Plaintiff Pablo Marquez ("Plaintiff" or "Marquez") as follows.  Unless specifically admitted below, Moynihan denies each and every allegation, claim and prayer for relief contained in the Complaint.

## INTRODUCTION

1.      Paragraph 1 of the Complaint consists of conclusions of law and no response is required.  To the extent a response is required, the allegations are denied.

2.      Looking for an artist to collaborate on a non-fungible token ("NFT") project, Moynihan contacted Marquez to form a partnership relating to the creation and sale of NFTs (the "Partnership").  The members of the Partnership consisted of Moynihan, Marquez, and another individual, Zack Tanner (the "Partners").  During the course of the Partnership, Moynihan received a share of the Partnership's profits, as the Partners had agreed, in the form of the cryptocurrency Ethereum.  Moynihan denies all other allegations contained in Paragraph 2 of the Complaint.

3.      Moynihan admits he received a letter from Marquez's legal counsel.  The content of the letter speaks for itself, and Moynihan denies the characterization of the letter contained in Paragraph 3 of the Complaint.

4.      Moynihan admits that he sent a letter, through counsel, to Marquez. The content of the letter speaks for itself, and Moynihan denies the characterization of the letter contained in Paragraph 4 of the Complaint and denies any remaining allegations in the paragraph.  Moynihan has insufficient knowledge to admit or deny the allegations contained in Footnote 1 of Paragraph 4 of the Complaint, and on that basis, denies those allegations.

5.      Paragraph 5 of the Complaint consists of conclusions of law and no response is required.  To the extent a response is required, Moynihan denies the remaining allegations contained in Paragraph 5.

## JURISDICTION AND VENUE

6.      Paragraph 6 of the Complaint consists of conclusions of law and no response is required. To the extent a response is required, the allegations are denied.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7

7.      Paragraph 7 of the Complaint consists of conclusions of law and no response is required. To the extent a response is required, the allegations are denied.

8.      Moynihan admits he resides in the Eastern District of California.  The remaining allegations in Paragraph 8 of the Complaint consists of conclusions of law and no response is required.  To the extent any response is required, Moynihan denies the remaining allegations contained in Paragraph 8 of the Complaint.

**PARTIES**

9.      Moynihan has insufficient knowledge to admit or deny the allegations contained in Paragraph 9 of the Complaint, and on that basis, denies those allegations.

10.     Moynihan denies that Marquez is the sole creator and designer of the *Robotos* Works.  Moynihan has insufficient knowledge to admit or deny the remaining allegations contained in Paragraph 10 of the Complaint, and on that basis, denies those allegations.

11.     Moynihan admits he resides in Granite Bay, California.

**GENERAL ALLEGATIONS**

12.     Moynihan contacted Marquez on July 8, 2021 to inquire whether Marquez was connected to the *Meta Bots* NFT project, or if someone was using images from Marquez's *Bottts* library of images.  Moynihan has insufficient knowledge to admit or deny the remaining allegations contained in Paragraph 12 of the Complaint, and on that basis denies the allegations.

13.     Marquez responded that the *Meta Bots* NFT project was not his.  Moynihan—*not Marquez*—brought up the idea of starting an NFT project with Marquez and thus Moynihan denies all remaining allegations contained in Paragraph 13 of the Complaint.

14.     Moynihan admits the allegations contained in Paragraph 14 of the Complaint.

15.     Moynihan denies the characterization contained in Paragraph 15 of the Complaint that Marquez began building the *Robotos* NFT project on his own.  Moynihan had been working with Marquez leading up to July 10, 2021 in developing the concept, design, and other key aspects of the *Robotos* NFT project.  Moynihan has insufficient knowledge to admit or deny the remaining allegations contained in Paragraph 15 of the Complaint, and on that basis denies the allegations.

-2-

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

16.     On July 11, 2021, with Moynihan's advice and approval, Marquez made an announcement on the Discord with a link to the Partnership's *Robotos* notion board.  Moynihan has insufficient knowledge to admit or deny the remaining allegations in Paragraph 16 of the Complaint, and on that basis denies the allegations.

17.     Again with Moynihan's advice and approval, Marquez drew some sketches of *Robotos* characters on livestreams and shared images of those sketches on Discord.

18.     Moynihan admits that Marquez and Moynihan continued to communicate regarding the Partnership's *Robotos* project.  The Partnership also decided to set up a Discord channel.  However, because Marquez was "new to all this," he noted that "whatever help" Moynihan—who had significantly more experience than Marquez in this area—could provide in setting up the Discord channel was welcome.

19.     Marquez and Moynihan agreed to bring another person on board, Zack Tanner, to assist with the *Robotos* project.  Marquez and Moynihan also agreed that the Partnership would "split everything three ways" relating to *Robotos* between Marquez, Moynihan and Tanner. Moynihan denies all remaining allegations contained in Paragraph 19 of the Complaint.

20.     Moynihan denies the allegations contained in Paragraph 20 of the Complaint.

21.     Moynihan denies the allegations contained in Paragraph 21 of the Complaint.

22.     Moynihan admits that Marquez created a private Discord group for the Partnership.  Moynihan has insufficient knowledge to admit or deny the remaining allegations contained in Paragraph 22 and, on that basis, denies the allegations.

23.     In the Partnership's private Discord group, Marquez shared his production board and an incomplete draft of the FAQ for the NFT project.  After a multi-hour call in which the Partners discussed each of the Partners' responsibilities for the NFT project and other details of the partnership, Marquez sent around notes from the call. Moynihan denies all remaining allegations contained in Paragraph 23 of the Complaint.

24.     Moynihan denies the allegations contained in Paragraph 24 of the Complaint.

25.     Moynihan denies the allegations contained in Paragraph 25 of the Complaint.

26.     Moynihan denies the allegations contained in Paragraph 26 of the Complaint.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

27.     Some of Moynihan's many contributions he provided to the Partnership included handling the most difficult coding tasks, such as writing the smart contract and building the Web3 application for the NFT project.  Moynihan denies the remaining allegations contained in Paragraph 27 of the Complaint.

28.     Moynihan denies the allegations contained in Paragraph 28 of the Complaint.

29.     One of Moynihan's many contributions he provided to the Partnership included writing the smart contract for the NFT project, which is an essential component of all NFTs, including the sale and purchase of the NFT. The license included an MIT license.  Moynihan denies the remaining allegations contained in Paragraph 29 of the Complaint.

30.     Moynihan denies that the artwork connected to the *Robotos* project constitutes "Marquez's proprietary artwork."  No artwork is contained in the coding script of the smart contracts.

31.     Moynihan denies the allegations contained in Paragraph 31 of the Complaint.

32.     Moynihan denies the allegations in Paragraph 32 of the Complaint to the extent the dates of presale and minting of the Partnership's *Robotos* NFT project are incorrect.  Moynihan admits the remaining allegations contained in Paragraph 32 of the Complaint.

33.     Each of the *Robotos* tokens generated is associated with one specific illustration. Moynihan denies the remaining allegations in Paragraph 33.

34.     Moynihan denies the allegations contained in Paragraph 34 of the Complaint.

35.     Moynihan denies the allegations contained in Paragraph 35 of the Complaint.

36.     Moynihan has insufficient information to either confirm or deny the allegations contained in Paragraph 36 of the Complaint, and on that basis denies the allegations.

37.     Moynihan admits that when consumers bought a *Robotos* token, they received access to related images.  The remaining allegations contained in Paragraph 37 consist of legal conclusions to which no response is required.  To the extent a response is required, Moynihan denies those allegations.

38.     The content of the license referred to in Paragraph 38 of the Complaint speaks for itself, and no admission or denial is necessary.  To the extent a response is necessary, Moynihan

-4-

155684535.7

1   denies any characterization of the license referred to in Paragraph 38 of the Complaint.

2       39.     Moynihan denies the allegations contained in Paragraph 39 of the Complaint.

3       40.     Moynihan admits that once the tokens were sold at minting, royalties were

4   distributed to a wallet.  Moynihan denies the remaining allegations contained in Paragraph 40 of

5   the Complaint.

6       41.     Moynihan denies the allegations contained in Paragraph 41 of the Complaint.

7       42.     Moynihan denies the allegations contained in Paragraph 42 of the Complaint.

8       43.     Moynihan denies the allegations contained in Paragraph 43 of the Complaint.

9       44.     Moynihan denies the allegations contained in Paragraph 44 of the Complaint.

10      45.     Moynihan denies the allegations contained in Paragraph 45 of the Complaint.

11      46.     Moynihan denies the allegations contained in Paragraph 46 of the Complaint.

12      47.     Moynihan denies the allegations contained in Paragraph 47 of the Complaint.

13      48.     Moynihan admits that he shared a message on the Partnership's *Robotos* Discord

14  channel.  The content of that message speaks for itself.  Moynihan denies the remaining

15  allegations contained in Paragraph 48 of the Complaint.

16      49.     Moynihan admits that he received a portion, but not all, of the royalties he was

17  entitled to as a Partner.  Moynihan denies the remaining allegations contained in Paragraph 49 of

18  the Complaint.

19      50.     Moynihan admits that Marquez messaged Tanner and Moynihan on August 20,

20  2021.  The content of that message speaks for itself.  Moynihan denies all remaining allegations

21  contained in Paragraph 50 of the Complaint.

22      51.     Moynihan admits that he was removed as a moderator on the *Robotos* Discord

23  server.  The content of the messages between Moynihan and Marquez speaks for itself.

24      52.     As a Partner, Moynihan was entitled to receive an equal share of royalties from the

25  *Robotos* project.  Moynihan received only a partial distribution of those royalties amounting to

26  approximately $900,000.  Moynihan denies all remaining allegations contained in Paragraph 52

27  of the Complaint.

28      53.     On November 23, 2021, Marquez wrote to Moynihan regarding royalties.  The

-5-

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

content of that message speaks for itself.

54.     Moynihan denies the allegations contained in Paragraph 54 of the Complaint.

55.     Moynihan admits that he received the letter from Marquez's counsel attached as Exhibit 1 to the Complaint.  The content of the letter speaks for itself.

56.     Moynihan admits that his counsel sent the letter attached as Exhibit 2 to the Complaint. The content of the letter speaks for itself, and Moynihan denies Marquez's characterization of the letter.

57.     Paragraph 57 of the Complaint consists of conclusions of law and no response is required.  To the extent a response is required, the allegations are denied.

58.     Paragraph 58 of the Complaint consists of conclusions of law and no response is required.  To the extent a response is required, the allegations are denied.

## FIRST CLAIM FOR RELIEF

Moynihan incorporates all admissions and denials to each allegation contained in Paragraphs 1 through 58 of the above.

59.     Moynihan denies the allegations contained in Paragraph 59 of the Complaint.

60.     Moynihan denies the allegations contained in Paragraph 60 of the Complaint.

61.     Moynihan denies the allegations contained in Paragraph 61 of the Complaint.

62.     Moynihan denies the allegations contained in Paragraph 62 of the Complaint.

63.     Paragraph 63 of the Complaint consists of conclusions of law and no response is required.  To the extent a response is required, the allegations are denied.

64.     Moynihan denies the allegations contained in Paragraph 64 of the Complaint.

65.     Moynihan has insufficient knowledge to either admit or deny the allegations contained in Paragraph 65 and, on that basis, denies them.

66.     Paragraph 66 of the Complaint consists of conclusions of law and no response is required. To the extent a response is required, the allegations are denied.

67.     Paragraph 67 of the Complaint consists of conclusions of law and no response is required. To the extent a response is required, the allegations are denied.

## SECOND CLAIM FOR RELIEF

1    Moynihan incorporates all admissions and denials to each allegation contained in

2    Paragraphs 1 through 67 of the above.

3    68.    Paragraph 68 of the Complaint consists of conclusions of law and no response is

4    required. To the extent a response is required, the allegations are denied.

5    69.    Moynihan denies the allegations contained in Paragraph 69 of the Complaint.

6    70.    Moynihan denies the allegations contained in Paragraph 70 of the Complaint.

7    71.    Moynihan denies the allegations contained in Paragraph 71 of the Complaint.

8    72.    Moynihan denies the allegations contained in Paragraph 72 of the Complaint.

9    73.    Moynihan denies the allegations contained in Paragraph 73 of the Complaint.

10    74.    Moynihan denies the allegations contained in Paragraph 74 of the Complaint.

11    75.    Moynihan admits that the *Robotos* NFT project is a partnership, that he is a partner

12    in the partnership, and he is entitled to continued royalties from the project.  Moynihan denies all

13    remaining allegations contained in Paragraph 75 of the Complaint.

14    76.    Moynihan has informed Marquez that he may need to initiate litigation in

15    connection with, in part, unpaid royalties Moynihan is entitled to that are being withheld by

16    Marquez.  Moynihan denies all remaining allegations contained in Paragraph 76.

17    77.    Paragraph 77 of the Complaint consists of conclusions of law and no response is

18    required. To the extent a response is required, the allegations are denied.

19                              **PRAYER FOR RELIEF**

20    Moynihan denies that Marquez is entitled to the relief requested.

21

22                              **AFFIRMATIVE DEFENSES**

23                          **FIRST AFFIRMATIVE DEFENSE**

24          **(Failure to State Facts Sufficient to Constitute a Cause of Action)**

25    The Complaint, and each and every cause of action alleged therein, fails to state facts that,

26    if proven, are sufficient to constitute a cause of action upon which the requested relief may be

27    granted against Defendant.

28                          **SECOND AFFIRMATIVE DEFENSE**

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7

**(Unclean Hands)**

The Complaint, and each and every cause of action alleged therein, is barred by the doctrine of unclean hands.

<u>**THIRD AFFIRMATIVE DEFENSE**</u>

**(Estoppel)**

The Complaint, and each and every purported cause of action alleged therein, is barred by the doctrine of estoppel due to Plaintiffs' own acts or omissions.

<u>**FOURTH AFFIRMATIVE DEFENSE**</u>

**(Waiver)**

The Complaint, and each and every purported cause of action alleged therein, is barred by the doctrine of waiver.

<u>**FIFTH AFFIRMATIVE DEFENSE**</u>

**(Failure to Name Indispensable Parties)**

Plaintiff has failed to join an indispensable party to this action:  Zack Tanner.  The Partnership was formed by three Partners, Moynihan, Marquez and Tanner.  Plaintiff's requested relief, finding that no partnership was formed, would potentially impair the interests of Tanner.

<u>**SIXTH AFFIRMATIVE DEFENSE**</u>

**(Attorney Fees Are Not Recoverable)**

Attorney's fees are not recoverable for the claims asserted in the Complaint.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7

**DEFENDANT'S COUNTERCLAIMS**

Counter-Claimant William Moynihan ("Moynihan" or "Counter-Claimant") hereby brings counterclaims and alleges as follows:

## I.      INTRODUCTION

1.      Moynihan has twenty-years of experience as a graphic designer, web designer, user interface ("UI") and user experience ("UX") designer, software engineer and entrepreneur. Through his career, he has worked closely at the forefront of technology and has founded several successful startups.

2.      In 2017, Moynihan began researching, investing in and working on various projects related to cryptocurrency.  Recognizing the quickly rising value of the emerging market of non-fungible tokens ("NFTs"), Moynihan created and launched his own collection of NFTs: *CryptoBros HODL Gang*.  Around this time, Moynihan spent significant time researching the NFT market, interacting with the NFT community, and promoting his *CryptoBros HOLD Gang* NFT collection.

3.      Taking what he learned from the launch of his first NFT project, Moynihan began searching for a partner to launch a new NFT project.

4.      In July 2021, Moynihan identified promising artwork and contacted the artist of the work, Defendant Pablo Marquez ("Marquez") to see if he was interested in working together to launch an NFT project.

5.      Thereafter, Moynihan and Marquez formed a partnership (the "Partnership") and worked closely together for several weeks developing and launching a new NFT project (the "*Robotos* NFT Project").

6.      At Marquez's suggestion, Moynihan and Marquez brought on a third partner, Zack Tanner (collectively, the "Partners").  As part of the agreement for bringing in Tanner as a partner, Marquez, Tanner and Moynihan agreed "to split everything three ways" between the Partners.

7.      Each Partner made significant contributions to the *Robotos* NFT Project and the project was a wild success.  The *Robotos* NFT Project has gone on to bring in hundreds of

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

thousands of dollars in royalties to the Partnership, with the most valuable *Robotos* NFTs selling for nearly $100,000 *each*.

8.      Despite this rampant success (or because of it), Marquez wrongfully shut out Moynihan from the Partnership, is withholding royalties paid to the Partnership and owed to Moynihan, and is claiming sole ownership of the assets of the Partnership including the *Robotos*.

9.      As a partner in the Partnership, Moynihan is a one-third co-owner of the assets of the Partnership, including the intellectual property rights to the *Robotos*, and all profits or royalties accrued.  In order to protect these rights and recover what is owed to him, Moynihan seeks declaratory judgment and asserts claims of breach of the partnership agreement, breach of the implied partnership agreement, breach of fiduciary duty, and unjust enrichment.  And to determine the value of the assets of the Partnership and amount owed to Moynihan, he demands an accounting.

## II.      THE PARTIES

10.      Counter-Claimant William Moynihan is an individual residing in Granite Bay, California.  Moynihan has been a graphic designer, web designer, UI/UX designer, software engineer and entrepreneur for over twenty years.  He has found success in numerous startup companies.  One such example includes founding a home design social network, RoomReveal, which Moynihan designed and raised significant capital for through angel investors before the company was successfully acquired in 2014.  Moynihan has significant experience in design and marketing with a Bachelor of Arts in marketing from Florida Atlantic University, and through his work as a user interface and experience designer for the last two decades.  Moynihan also has significant experience in the cryptocurrency market, including in the NFT market.

11.      Counter-Defendant Pablo Marquez is an individual who, upon information and belief, resides in Mexico City, Mexico.  On information and belief, prior to the *Robotos* NFT Project, Marquez had limited to no experience in the NFT market and had never produced or launched an NFT collection.

## III.      JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

1332(a)(1).  Moynihan is an individual residing in Granite Bay, California.  Marquez is an individual who, upon information and belief, resides in Mexico City, Mexico.  The amount in controversy exceeds $75,000, exclusive of interests and costs.

13.    This Court separately has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a) because Moynihan's counterclaims arise out of the same transaction or occurrence as Marquez's claims.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action have occurred and/or will occur in this District.

## IV.    GENERAL ALLEGATIONS

**A.    Moynihan, Marquez and Tanner form a Partnership**

15.    In or around April 2021, Moynihan began to research and prepare plans to enter the NFT market.  Moynihan created artwork and the underlying code necessary for a new NFT project titled *CryptoBros HODL Gang*.  He began interacting with the NFT community to promote the new project.

16.    The process of creating and launching the *CryptoBros HODL Gang* NFT project, helped Moynihan refine his plan for successfully launching and marketing NFTs.  Once he had refined that plan, Moynihan began looking for an artist to partner with on an NFT project.

17.    One key aspect of Moynihan's plan for his next NFT project was to create a generative profile picture ("PFP") NFT.  PFP NFTs generally focus on the torso and head of characters.  While each PFP character maintains the same high-level design, they are distinguished from each other through varying attributes (such as hats, eyes, mouths, torsos, etc.) that can be easily combined to create new, exciting characters.

18.    During the creation of generative PFP art, a script combines different styles of those attributes to create unique characters. Examples of this generative PFP art style can be seen in the below Robotos NFTs.



ORY
IMS

15568

1

2

3

4          19.     Moynihan spent considerable time researching the characteristics of successful

5   PFP NFTs to create characters which excite the NFT community, how to effectively market the

6   NFTs, and how best to grow an NFT community.  Because the value of an NFT is determined by

7   the NFT community members, each of those aspects is integral to the success of an NFT project.

8          20.     On June 8, 2021, Moynihan discovered a collection of NFTs called *Meta Bots*.

9   After doing some research, Moynihan found that the artwork used for the *Meta Bots* NFTs

10  appeared to be from an open-source art library called *Bottts*, attributed to Marquez as the artist.

11         21.     That same day, Moynihan sent Marquez a message through Twitter inquiring

12  whether he was behind the *Meta Bots* NFT project, or if someone was using his work.  The next

13  day, Marquez confirmed to Moynihan that he was not connected to the *Meta Bots* NFT project.

14         22.     In that same conversation, Moynihan suggested that Marquez should launch an

15  NFT project.  Marquez, apparently with little knowledge of how NFTs operated, asked Moynihan

16  how he would go about creating an NFT project.  With his experience in recently launching his

17  own NFT project, Moynihan began providing Marquez advice on how to launch an NFT project.

18         23.     Marquez then sent Moynihan a message showing new artwork Marquez was

19  working on consisting of black and white animal-like characters titled *The Techies*.

20

21

22

23

24

25         24.     Recogr                                      gnificant changes to

26  become a successful PFP-style NFT project, Moynihan set up a call with Marquez to discuss the

27  potential of starting an NFT project together and to advise him on how the artwork would need to

28  be changed.  During that call, Moynihan expressed his concerns with turning *The Techies* into

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

1   NFTs, asking if Marquez would be able to change the characters into a PFP style.  Moynihan

2   suggested, for instance, that Marquez focus on the torso and head of the character and add color.

3   Marquez was resistant to Moynihan's advice to focus on the PFP style, but said he would think

4   about it.

5       25.     The next day, July 10, 2021, Marquez texted Moynihan asking to discuss their

6   NFT project further.  In those texts to Moynihan, Marquez suggested that "_we_ create a totally new

7   bots collection" for their NFT project.  He also noted these new characters would be in color, as

8   Moynihan had suggested.  Ultimately, following Moynihan's advice to focus on a PFP style of

9   art, and to incorporate color, Moynihan and Marquez began creating the _Robotos_ characters.

10      26.     Throughout his conversations with Moynihan, Marquez made clear that he

11  believed Moynihan and Marquez were working on the _Robotos_ NFT Project together and both

12  had equal say and control in the project.

13      27.     For instance, on July 11, 2021, Marquez asked Moynihan if he "would be open to

14  the idea" of bringing in another member to the Partnership.  Marquez suggested they add Zack

15  Tanner to the team.  Tanner was a cofounder with Marquez of another company, Blush.

16  Moynihan responded that he would consider it, and would let Marquez know if he agreed to bring

17  another partner on board.  The decision to bring Tanner onboard could not be made without

18  Moynihan's agreement.

19      28.     As part of Marquez's ask to add Tanner to the team, also on July 11, 2021,

20  Marquez told Moynihan that the three of them—Marquez, Moynihan and Tanner—could split

21  everything associated with the _Robotos_ NFT Project three ways.

22

23

24

25  **pablostanley** 07/11/2021

    si si si

26  Dude, I'm new to all this, so whatever help would be awesome!

    Have you given any thought about getting some help from another dev?

27  All of this requires a lot of work, not just on the art and dev, but also on community.

    So, getting another person on board would allow us to do more stuff 🙂

28  I would be down to split everything three ways.

    (I haven't told my friend anything, btw)

155 His name is Zack Tanner. He's fullstack. I trust him with my life. He's one of my cofounders at Blush.

    Here's his LinkedIn: https://www.linkedin.com/in/ztanner/

29.     Shortly after, Moynihan, Marquez and Tanner had a conference call to formally discuss forming a partnership for the *Robotos* NFT Project with the three of them as partners.  On that call, the three confirmed Marquez's offer and they agreed that each of them would be an equal partner and split everything—including losses and profits—evenly.

30.     On that call and in later discussions, the Partners specifically discussed how to split royalties from sales of the *Robotos* NFTs.  The Partners agreed to split those royalties evenly between the three Partners—the same agreement they reached regarding everything else owned by the Partnership.

**B.     Creating the *Robotos* NFT Collection**

31.     The three Partners worked closely on getting the *Robotos* NFT Project ready to be minted.  Each Partner agreed to take on different tasks based on the skills and expertise they brought to the Partnership.  After a call with the Partners in which they outlined and agreed to those obligations, Marquez sent around notes from the call of what the Partners discussed, including some of the responsibilities each Partner had agreed to take on.  After readying the *Robotos* NFTs, the Partners planned to sell the NFTs through the *Robotos* website using the Web3 app Moynihan developed.

32.     Moynihan agreed to take up the most difficult coding tasks:  writing the smart contract associated with the tokens and building the Web3 application which served as the primary point-of-sale for the tokens.

33.     A smart contract is a self-executing contract with the terms of the agreement between the buyer and seller being written into lines of code.  The smart contract controls and tracks all transactions involving NFTs.  The smart contract is a key component of any NFT, necessary to transfer the NFT and to verify the owner of the NFT.  It also serves to connect the NFT (which the consumer owns) to the image of the NFT, meaning without the smart contract,

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

the NFT would have no metadata associated with it and thus, no image.  In other words, without the smart contract, there is no NFT.

34.     Additionally, because the smart contract is an essential component of all sales, it directly correlates to the generation of royalties from future sales of the tokens.

35.     Smart contracts are owned by an "Ethereum wallet," a digital wallet which allows the owner of the wallet to control the functions of the smart contract.

36.     In deploying the smart contract, Moynihan's personal Ethereum wallet was connected to and controlled the smart contract.  As such, initially, Moynihan was the only person with the ability to execute the functions of the smart contract.

37.     Soon after deploying the smart contract, Moynihan executed a function to transfer ownership of the contract to a "multi-signature wallet" (the "Partnership's Wallet"), i.e., a wallet which requires two or more private keys to execute any transactions.  Moynihan made each Partner an equal owner of this multi-signature wallet and he assigned equal control of the wallet to each Partner.  This means that instead of Moynihan having unilateral control of the functions of the smart contract—for instance being able to start and stop the minting of tokens, set the minting price, or withdraw funds—all three Partners are required to sign an electronic order before the smart contract will execute any function.

38.     The Partnership's Wallet is still the owner of the smart contract. Thus, Moynihan's agreement, along with the other two Partners, is necessary to issue any orders through the smart contract.  For instance, if the third-party service which hosts the metadata for the NFTs (which is how the image is connected to each NFT) went down, the agreement of all three Partners would be necessary to reconnect the metadata, and thus the image, to the NFT.

39.     Because the Partnership's Wallet owns the smart contract, it was designated as the default owner of the *Robotos* NFT collection on OpenSea (a popular NFT marketplace).  This meant that the royalty settings, by default, were controlled by the Partnership's Wallet.  After royalties were received by the Partnership's Wallet, the agreement of all three Partners was required to distribute royalties to each Partner's personal wallet.

40.     In or around August 2, 2021, Moynihan updated the settings of the *Robotos* NFT

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

collection on OpenSea to set royalties at 4% and designate the distribution of royalties to the Partnership's Wallet address.  Thus, anytime a *Robotos* NFT was sold on OpenSea, 4% of the sale price was automatically distributed to the Partnership's Wallet.

41.    Moynihan also added a personal Ethereum wallet of each Partner to the *Robotos* OpenSea account as "collaborators."  This allowed any of the three Partners to more easily manage the *Robotos* NFT collection settings, such as marketing images and text, on OpenSea.

42.    In addition to creating the smart contract, Moynihan was also responsible for researching the NFT market, advising the Partnership regarding the best routes for success in the NFT market, building the web app, and setting up and managing the Discord server for the *Robotos* community and other marketing efforts.

43.    Tanner was primarily responsible for writing the script that controlled the automatic generation of the unique artwork for the NFTs.  That script controlled how different styles of attributes were combined and the rarity of different styles.  Moynihan, who had prior experience from his *CryptoBros HODL Gang* NFT collection in writing these scripts, also offered significant help and guidance to Tanner relating to the logic behind this script.

44.    Marquez's core responsibilities included creating artwork for the tokens, as well as promoting and marketing the tokens.

45.    As he did with Tanner's responsibilities for the Partnership, Moynihan also provided significant assistance and advice to Marquez regarding his responsibilities.  For instance, Moynihan provided guidance to Marquez on the design of the artwork for the *Robotos* characters.  Specifically, Moynihan advised Marquez that they should make all the tokens animated gifs, which would create more unique and desirable characters.  The Partnership decided to proceed with Moynihan's advice, and the animated gif style of the *Robotos* NFTs became a key distinguishing element of the collection.  Moynihan also instructed Marquez that the *Robotos* characters should be made in a PFP-style, focusing on the torso-up and using color. Marquez followed Moynihan's advice and the *Robotos* characters incorporated those suggestions.

46.    Each of the Partners also contributed to the Partnership by making various payments to fund the Partnership's project.  For instance, Moynihan paid the costs to set up the

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

1  Partnership's Wallet, the cost of upgrading the Web3 node, and contributed to the costs of

2  deploying the smart contract.

3  **C.    Sale of the *Robotos* NFT Collection**

4        47.    On August 2, 2021, the Partnership was ready to begin a small pre-sale of 900

5  *Robotos* tokens and then begin the sale of the remaining 9,099 tokens the next day.  The pre-sale

6  went off without a hitch and was an instant success.  The 900 tokens sold out in just seventeen

7  minutes.

8        48.    That evening, Moynihan discovered a minor bug in the smart contract.  The bug

9  would only affect the sale of the last token by preventing that token from being minted unless the

10  transaction was initiated by the contract's owner wallet address. In other words, even with the bug

11  in the smart contract, there would be no issues in selling the first 9,998 of the 9,999 tokens.

12        49.    In order to avoid this bug, Moynihan implemented a fix in the *Robotos* web app

13  that would show that the collection was "Sold Out" once the 9,998th token was sold, preventing

14  anyone from attempting to purchase the 9,999th token (which was the only token affected by the

15  bug).  The Partnership could then buy the last token and avoid any issues with the last token.

16        50.    The next day, August 3, was the date of the planned sale of the *Robotos* collection.

17  That morning, the Partners discussed the last token bug.  While Tanner and Marquez suggested

18  the Partnership may want to delay the minting of the tokens, the Partnership decided to proceed

19  with the minting.

20        51.    Once the main sale began, it became instantly clear *Robotos* was an enormous

21  success.  Over 600 *Robotos* tokens were being minted *every minute* during the main sale.

22        52.    Because of this enormous demand, the *Robotos* web app was operating slowly due

23  to a high level of web traffic.

24        53.    On information and belief, Marquez mistakenly believed that the lag in the web

25  app was related to the last token bug, when in reality it was due to the heavy web traffic due to

26  the immense popularity of the NFT collection.  Marquez panicked and asked Tanner and

27  Moynihan to pause the sale.  In order to do so, each Partner would need to agree and sign an order

28  under the smart contract to pause the sale.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

54.     While Moynihan voted against pausing the sale, noting it could cause many people to lose money on failed transactions, Tanner voted with Marquez.  Outvoted by the two other Partners, Moynihan agreed to sign the order under the smart contract to pause the sale.

55.     When the sale was paused, only roughly 150 of the 9,999 tokens were left unminted.  Approximately 300 transactions failed because of the pause.  After Marquez calmed down from his initial panic, the Partners agreed to restart the sale and allowed the remaining *Robotos* to be minted.

56.     As planned, once the 9,998th *Robotos* was minted, the Partners successfully minted the 9,999th token.  The minor bug in the smart contract ended up being a complete non-issue.

**D.     Marquez Attempts to Push Moynihan Out of the Partnership**

57.     The day after the main sale of the *Robotos*, August 4, Moynihan discovered that he no longer had access to the *Robotos* Discord channel.  More concerning, Moynihan discovered that his personal Ethereum wallet had been removed as a collaborator from the *Robotos* OpenSea account, and that the Partnership's Wallet had been removed as the account owner.  That meant Moynihan could no longer access or change the settings of the *Robotos* OpenSea account.

58.     Moynihan quickly started a call with Marquez regarding these issues.  During that call Moynihan inquired as to why his wallet had been removed from the *Robotos* OpenSea account, and why the Partnership's Wallet was removed as the account owner.  Marquez claimed he was unable to access the account settings from his own wallet and so had assumed that Moynihan had "hijacked" the account.  Moynihan had done no such thing.

59.     Marquez admitted he contacted OpenSea and accused Moynihan of hijacking the account, requesting that they remove Moynihan's wallet and the Partnership's Wallet.

60.     On information and belief, based on Marquez's (false) accusations, OpenSea complied with his requests and removed the Partnership's Wallet.

61.     On information and belief, either Marquez removed Moynihan's personal wallet from the Open Sea account, or based on Marquez's (false) accusations, OpenSea complied with his requests and removed Moynihan's personal wallet from the account.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

62.     When Moynihan asked Marquez why Marquez had not simply called him to check if Moynihan had "hijacked" the account, Marquez claimed to have "forgotten" he had Moynihan's phone number—*despite that the two had been in continuous contact for the last several weeks*.

63.     On information and belief, Marquez knowingly misled the representatives of OpenSea in order to remove Moynihan's wallet and the Partnership's Wallet from the *Robotos* account without Moynihan's authorization.

64.     Ultimately, Marquez informed Moynihan that now that the *Robotos* were all minted and sold, he did not want Moynihan to be on the *Robotos* project anymore.  Moynihan reminded Marquez that he did not work for Marquez, and they were a partnership.

65.     On that same call, Marquez ultimately agreed that Moynihan owned a one-third stake in *Robotos*.  However, Marquez still asked that Moynihan step down as a developer from the team, but assured Moynihan that he would remain a one-third owner of the project, and continue to receive his third of the royalties.

66.     Based on Marquez's assurances that Moynihan would remain a one-third partner, and would add the Partnership's Wallet back to the OpenSea account again, Moynihan agreed to step down as a developer only.

67.     After the call, Marquez set up a monthly recurring meeting with the Partners for disbursement of royalties from the resale of the *Robotos* tokens.

68.     On or around September 8, 2021, Moynihan discovered that the *Robotos* collection was listed on another NFT marketplace, Nifty Gateway.  Neither Tanner nor Marquez ever informed Moynihan that *Robotos* were being sold on Nifty Gateway, and Moynihan never received his share of the royalties for these sales.

69.     On information and belief, the *Robotos* sales on Nifty Gateway total nearly $1,000,000 and Marquez has withheld the royalties owed to Moynihan for these sales.

70.     Then, on November 23, 2021, Marquez informed Moynihan that Marquez intended to reduce the amount of royalties paid to the Partners from 4% to 3%.  Marquez then once again removed the Partnership's Wallet from the OpenSea account, completely locking

1    Moynihan out from accessing the account.

2          71.   Over the next several days, the Partners discussed the royalties owed to Moynihan.

3    On November 27, 2021, Tanner indicated that he and Marquez would agree to send Moynihan the

4    one-third of royalty payments owed to Moynihan from sales on OpenSea.  However, on

5    information and belief, Marquez refused to pay Moynihan his full share of royalties from sales of

6    *Robotos* made on Nifty Gateway.

7          72.   When Moynihan again inquired regarding the royalties from the Nifty Gateway

8    sales, Tanner and Marquez stopped responding to Moynihan.  Days later, Marquez's attorney

9    informed Moynihan that Marquez would stop distributing Moynihan the royalties he was entitled

10   to.  Marquez followed through with his threat and has since withheld the royalties owed to

11   Moynihan and has wrongfully locked Moynihan out from managing the Partnership or accessing

12   any financial information of the Partnership.

13                              **First Claim for Relief**

14                   **Breach of Partnership/Joint Venture Agreement**

15         73.   Moynihan incorporates and each and every allegation contained in Paragraphs 1-

16   72 above, as if alleged herein.

17         74.   In July 2021, Moynihan, Marquez, and Tanner entered into a valid partly oral,

18   partly written joint venture/partnership agreement to form a company focused on creating and

19   selling an NFT collection.

20         75.   As part of that agreement, Moynihan was granted an ownership interest in the joint

21   venture/partnership and the right to manage and conduct the joint venture/partnership's business.

22   Moynihan, Marquez and Tanner also agreed to share the profits and losses of the joint

23   venture/partnership.

24         76.   Moynihan complied with all of his contractual obligations under the joint

25   venture/partnership agreement.

26         77.   Marquez materially breached this joint venture/partnership agreement by, among

27   other things, repudiating the existence of the joint venture/partnership; depriving Moynihan of his

28   ownership shares in the joint venture/partnership and the past, present, and future proceeds

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

1   therefrom; failing to include and/or disburse proceeds to Moynihan in other *Robotos* projects such

2   as the *Robotos* animated TV show being developed by Time Studios, other related *Robotos*-based

3   NFT collections (*e.g., Robopets*, *Robotos Original*, etc.), and merchandising relating to *Robotos;*

4   and obstructing Moynihan's right to manage and conduct the joint venture/partnership's business.

5       78.    As a result of Marquez's breaches of the agreement, Moynihan has suffered

6   damages in an amount to be established at trial.

7                   **Second Claim for Relief**

8         **Breach of Implied Partnership/Joint Venture Agreement**

9       79.    Moynihan incorporates and each and every allegation contained in Paragraphs 1-

10   78 above, as if alleged herein.

11       80.    Marquez and Tanner entered into an implied-in-fact joint venture/partnership

12   agreement with Moynihan, as shown by their course of conduct, to form a partnership/join

13   venture focused on producing and selling an NFT collection, and to share in the profits and losses

14   of the partnership/joint venture.

15       81.    By working with Moynihan to launch the successful *Robotos* NFT Project,

16   including through Moynihan's essential work in writing the *Robotos* smart contract, Tanner and

17   Marquez manifested the intent to form and operate a joint venture/partnership with Moynihan.

18   Marquez and Tanner were aware that Moynihan performed these and other acts in furtherance of

19   the joint venture/partnership in expectation of joint ownership, control, and profits.

20       82.    Moynihan performed all of his contractual obligations in accordance with his

21   agreement with Tanner and Marquez.

22       83.    Marquez materially breached this joint venture/partnership agreement by, among

23   other things, repudiating the existence of the joint venture/partnership; depriving Moynihan of his

24   ownership shares in the joint venture/partnership and the past, present, and future proceeds

25   therefrom; failing to include and/or disburse proceeds to Moynihan in other *Robotos* projects such

26   as the *Robotos* animated TV show being developed by Time Studios, other related *Robotos*-based

27   NFT collections (*e.g., Robopets*, *Robotos Original*, etc.), and merchandising relating to *Robotos;*

28   and obstructing Moynihan's right to manage and conduct the joint venture/partnership's business.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

84.    As a result of Marquez's breaches of this agreement, Moynihan has suffered damages in an amount to be established at trial.

### Third Claim for Relief

### Breach of Joint Venturer/Partner Fiduciary Duties

85.    Moynihan incorporates each and every allegation contained in Paragraphs 1-84 above, as if alleged herein.

86.    In or around July 2021, Moynihan, Marquez and Tanner entered into a joint venture/partnership focused on creating and selling an NFT collection.  Moynihan, Marquez and Tanner agreed that they would be joint venturers/partners in this endeavor.

87.    As joint venturers/partners, Marquez owed Moynihan the fiduciary duties of loyalty, care, disclosure, and good faith and fair dealing and all times. Pursuant to such fiduciary duties, Marquez was required to act with the utmost good faith towards Moynihan and to avoid acts and omissions adverse to Moynihan.

88.    Marquez breached his fiduciary duties to Moynihan, including the duties of loyalty, care, disclosure, and good faith and fair dealing, by engaging in the acts and omissions alleged herein. Such acts and omissions include, but are not limited to, unilaterally reducing Moynihan's royalty shares to benefit themselves, withholding the royalty payments Moynihan is entitled to, unilaterally removing Moynihan's access to the *Robotos* Discord channel, unilaterally removing Moynihan's wallet and the Partnership's Wallet from the *Robotos* OpenSea account, and obstructing Moynihan's right to manage and conduct the joint venture/partnership's business.

89.    As a direct and proximate result of these breaches, Moynihan has and will sustain damages in an amount to be proven at trial.

### Fourth Claim for Relief

### Unjust Enrichment

90.    Moynihan incorporates each and every allegation contained in Paragraphs 1-89 above, as if alleged herein.

91.    By engaging in the conduct described herein, including by withholding royalty payments Moynihan is entitled to, Marquez enriched himself to the detriment of Moynihan.

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7

92.     Moynihan invested significant time and effort in working in connection with the *Robotos* NFT Project, including by drafting the smart contract for the *Robotos* NFT, assisting with the design of the *Robotos* artwork, and marketing the *Robotos* project.

93.     Moynihan's work was integral to the success of the *Robotos* NFT Project, without which it would not have been minted at all.

94.     Moynihan's work created and continues to create significant revenue in the form of royalties from the sale and resale of the *Robotos* NFT.  Marquez is withholding these royalties and has thus been unjustly enriched by accepting Moynihan's work without fully compensating him.

95.     Additionally, on information and belief, Marquez has been unjustly enriched by receiving compensation, other revenue or benefit in connection with the *Robotos* project and associated projects, including but not limited to the animated *Robotos* TV show being developed by Time Studios, other related *Robotos*-based NFT collections (*e.g., Robopets*, *Robotos Original*, etc.), and merchandising relating to *Robotos*, and failing to fully compensate Moynihan for the essential work he performed in connection with *Robotos*.

96.     Moynihan seeks damages for this unjust enrichment in an amount to be proven at trial.

### Fifth Claim for Relief

### <u>Accounting</u>

97.     Moynihan incorporates each and every allegation contained in Paragraphs 1-96 above, as if alleged herein.

98.     In or around July 2021, Moynihan, Marquez and Tanner entered into a joint venture/partnership focused on creating and selling an NFT collection.  Moynihan, Marquez and Tanner agreed that they would be joint venturers/partners in this endeavor.

99.     Under the joint venture/partnership agreement, Moynihan is a one-third owner of all assets and property of the joint venture/partnership, and is entitled to one-third of the royalties generated by the *Robotos* NFTs.

100.    Marquez has refused to allow actively obstructed Moynihan access the finances

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7

1   relating to the joint venture/partnership, making it impossible for Moynihan to determine the

2   assets of the joint venture/partnership and amounts owed to Moynihan.

3       101.   Moynihan requests an accounting to determine the assets of the joint

4   venture/partnership and amounts owed to Moynihan.

5   **Sixth Claim for Relief**

6   **Declaratory Judgment (Cal. Code Civ Proc. § 1060)**

7       102.   Moynihan incorporates each and every allegation contained in Paragraphs 1-101

8   above, as if alleged herein.

9       103.   Moynihan and Marquez intended to and did enter into a partnership/joint venture

10  in connection with the creation of the *Robotos* NFT collection and all related works and projects.

11      104.   Moynihan and Marquez also agreed to a partially written, partially oral partnership

12  /joint venture agreement to govern the partnership/joint venture.

13      105.   In connection with the partnership/joint venture, Moynihan and Marquez agreed to

14  evenly split revenues and losses, and had equal control of the partnership/joint venture.  Both

15  parties also made monetary expenditures in connection with furthering the goals of the

16  partnership/joint venture.

17      106.   Despite the clear agreement otherwise, Marquez has repudiated the existence of

18  any partnership/joint venture with Moynihan.

19      107.   An actual controversy exists between Marquez and Moynihan as to whether they

20  formed a partnership/joint venture in connection with the *Robotos* project.

21      108.   Accordingly, Moynihan is entitled to a declaratory judgment that the *Robotos*

22  project and all derivative projects were a partnership/joint venture of which Moynihan is a one-

23  third owner.

24  **PRAYER FOR RELIEF**

25      WHEREFORE, Counter-Claimant pray for judgment against Counter-Defendant as

26  follows:

27      1.   For an award of restitution and damages, compensatory, statutory, punitive

28  damages and all other damages permitted by law in excess of $75,000, the exact amount

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

of which has yet to be ascertained;

2.     For interest to the extent permitted by law;

3.     For attorneys' fees and costs expended in the litigation of this action to the full extent permitted by law;

4.     For an accounting to determine the assets of the joint venture/partnership and amounts owed to Counter-Claimant;

5.     For a declaration that Moynihan and Marquez entered into a partnership/joint venture in connection with the *Robotos* project and any derivative projects, of which Moynihan is a one-third owner; and

6.     For such other and further relief as this Court deems appropriate.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Counter-Claimant hereby demands a jury trial for all issues properly triable to a jury in this lawsuit.

Dated:  February 16, 2022

By:  */s/ Britt L. Anderson*
Britt L. Anderson
BAnderson@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, California 94304-1212

Christian W. Marcelo (pro hac vice application forthcoming)
CMarcelo@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

Attorneys for Defendant and Counterclaimant

ANSWER TO COMPLAINT FOR DECLARATORY
JUDGMENT AND COUNTERCLAIMS

155684535.7